1

2                              **NOT FOR PUBLICATION**

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8

9    Continental Promotion Group, Inc., an)   No. CV-08-0070-PHX-SRB
     Arizona corporation; and CPG Marketing,)
10   Inc., a Florida Corporation,           )   **FINDINGS OF FACT, CONCLUSIONS OF**
                                            )   **LAW, & ORDER**
11                     Plaintiffs,          )
                                            )
12   vs.                                    )
                                            )
13                                          )
     Samuel Garvin and Rita Garvin, husband)
14   and wife; and Garvin Promotion Group,)
     LLC, an Arizona Limited Liability)
15   Company,                               )
                                            )
16                     Defendants.          )
                                            )
17   _____)

18          This matter arises out of Plaintiffs Continental Promotion Group, Inc. ("CPG") and

19   CPG Marketing, Inc.'s ("CPGM") claim that Defendant Samuel Garvin breached the terms

20   of both the June 3, 2005 Stock Purchase Agreement and the separate Consulting and

21   Noncompetition Agreement, and that Defendants Samuel Garvin, Rita Garvin, and Garvin

22   Promotion Group ("GPG") violated the Lanham Act and engaged in unfair competition.

23   Following a hearing on January 15, 2008, the Court granted Plaintiffs' Motion for Temporary

24   Restraining Order and ordered expedited discovery in preparation for a hearing on Plaintiffs'

25   Motion for Preliminary Injunction (Doc. 4). That hearing was held on February 22, 26, and

26   27, 2008 (the "Hearing"). Additionally, the Court herein resolves Defendant Samuel

27   Garvin's Motion to Dismiss (Doc. 10) and his Motion to Expedite consideration of that

28   Motion (Doc. 39). Having considered the evidence received at the Hearing, together with

the arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT[1]

### A.    Scope of CPG's Business Operations

"Continental Promotion Group is a global promotion solutions company" that provides customers with promotion management and fulfillment services. (Ex. 13 at CPG 0311.)  CPG provides its customers with "rebate program management," "sweepstakes and contest administration," "premium and collateral fulfillment," "direct marketing services," and "business to business trade performance incentives." (Ex. 13 at CPG 0311.)  As of June 3, 2005, CPG had offices in Scottsdale, Arizona; Phoenix, Arizona; Welland, Canada; Tipperary, Ireland; and Munich, Germany, and utilized Tactics Marketing to provide promotion services in Australia.

CPG has held itself out to existing and prospective customers as willing and able to provide promotion services, including rebates, premiums, sweepstakes, and giftcard fulfillment, anywhere in the world.  In an August 15, 2002 press release, Defendant Samuel Garvin, then CPG chairman and CEO, announced new fulfillment activities in Singapore and Malaysia.  The press release, in a quotation attributed to Mr. Garvin, stated: "CPG's worldwide reach allows any of our global clients to seamlessly execute promotions in all parts of the world, using CPG as its sole fulfillment resource." (Ex. 13 at CPG 0324.)  In marketing materials distributed to potential and existing clients, CPG advertised its capability to work "on a global, regional, or country-specific basis" and highlighted its experience in Canada, Europe, Asia, and Australia. (Ex. 12).  Additionally, as part of its marketing strategy, CPG sought to generate international business by circulating information regarding its promotion services to attendees at international trade shows such as CeBIT (Hanover, Germany), the International Consumer Electronics Show (Las Vegas, Nevada), and Retail

---

[1]Unless otherwise noted, the Findings of Fact refer to the period of time before the June 3, 2005 acquisition of CPG by CPGM.

Vision (various cities). These trade shows are attended by representatives of businesses from around the world.

CPG has run promotions or provided fulfillment services in countries located throughout the world, including, but not limited to, Australia, New Zealand, the countries of the European Union ("EU"), non-EU European countries, Iceland, India, Malaysia, Singapore, Israel, Jordan, Japan, Honduras, South Africa, Taiwan, Argentina, Canada, and the United States. For example, during the period of June 14, 2004 through July 31, 2004, CPG ran a Website-based rebate promotion for its client Website Pros that was valid in "all countries." (Ex. 19 at CPG 0892-93.) As another example, from November 2004 until April 2005, CPG ran Promotion No. 044588, a rebate promotion for its client Stanton Magnetics called the "Final Scratch 2 Trade In Program." (Ex. 9 at CPG 0093.) This promotion included fulfillment services in Taiwan, Japan, Australia, the United States and various European countries. (Ex. 6 at CPG 0024.)

As further evidence of CPG's international operations, CPG charges its clients differing fees for fulfilling rebates and premiums in various countries using a variety of methods (e.g., by check, wire transfer, international wire transfer, or by mailing a premium). For example, in a promotion quote dated March 10, 2004, CPG offered to fulfill the premium promotion by mail weighing up to 250g to European countries for €2.70 per submission. (Ex. 18 at CPG 0845.) In the same quote, CPG offered mail fulfillment up to 250g for €4.50 per submission when sent to Turkey, Israel, and South Africa. (Ex. 18 at CPG 0845.)

## B. Sale of CPG to CPGM

CPGM purchased CPG from Defendant Samuel Garvin pursuant to a Stock Purchase Agreement dated June 3, 2005 (the "SPA"). (Ex. 4.) As part of the SPA, Mr. Garvin received $5,000 and various distributed assets, including a jet aircraft valued at $20,000,000; CPG's ownership interest in a company called AZPB Limited Partnership (worth approximately $1,500,000); real property valued at $445,000; a brokerage account valued at $200,000; life insurance policies; and a $700,000 deposit on a new aircraft held by the manufacturer. (Ex. 4 at § 5.1.) The distributed assets section of the SPA also required Mr.

Garvin to assume an aircraft loan obligation of approximately $10,300,000. Both Mr. Garvin and Daniel Granger, CPGM's Chairman and CEO, are experienced businessmen who were familiar with the actual operations of CPG as of June 3, 2005, including its international operations. Mr. Garvin and CPGM were independently represented by legal counsel in the negotiation, drafting, and execution of the SPA, which the parties adopted as their joint agreement.

"[A]s an inducement to [CPGM] to execute and deliver th[e] [SPA] and to consummate the transactions . . . and to preserve the goodwill associated with [CPG's] business," Mr. Garvin made representations regarding the nature and scope of CPG's business and agreed to certain restrictions, including a worldwide, three-year non-competition provision, contained in § 6.3 of the SPA. (Ex. 4 at § 6.3.) In § 6.3, Mr. Garvin represented and agreed that CPG's "operations are Worldwide," and that a worldwide noncompetition restriction was "reasonable" in light of "the specialized nature of the Business," as that term is defined in the SPA. (Ex. 4 at § 6.3.) Prior to June 3, 2005, CPG had an existing plan in place to increase its international sales, and CPG's international business was growing. Since the date of the SPA, CPG's international sales have increased approximately five hundred percent. (Prelim. Inj. Hr'g Tr. ("Tr.") at 33:5-7.)

The SPA defines CPG's "Business" as "the business of processing and fulfilling rebates, gift cards and other promotional items for other companies." (Ex. 4 at 1.) The term "Competitor" means "any person or entity that now or hereafter engages in or attempts to engage in any activity or business similar to any aspect of the Business." (Ex. 4 at § 10.17(k).) In the SPA, Mr. Garvin agreed that for a period of three years he would not do the following:

> (a) engage in, continue in or carry on any business that competes in any aspect of the Business, including owning or controlling any financial interest in any Competitor;

> (b) consult with, advise or assist in any way, whether or not for consideration, any Competitor in any aspect of the Business, including advertising or otherwise endorsing the products or services of any such Competitor, soliciting customers or otherwise serving as an intermediary for any such Competitor or

- 4 -

loaning money or rendering any other form of financial assistance to any such Competitor;

(c) solicit, induce or otherwise offer employment or engagement as an independent contractor to, or engage in discussions regarding employment or engagement as an independent contractor with, any person who is or was an employee, commissioned salesperson or consultant of, or who performed similar services for, Company, or assist any third party with respect to any of the foregoing, unless such person has been separated from his or her employment or other relationship with Buyer and each of its Affiliates (including Company) for a period of six (6) consecutive months; provided, however, Shareholder may use the services of Brian Hatch and Maxine Kesten for assistance with Shareholder's personal affairs; or

(d) engage in any practice the purpose of which is to evade the provisions of this covenant not to compete.

(Ex. 4 at § 6.3.)  Mr. Garvin did not object to or comment upon the proposed provisions of SPA § 6.3 prior to signing the agreement other than to add the exemptions regarding the personal services of Mr. Hatch and Ms. Kesten found in subsection (c).  (*Compare* Ex. 4 at § 6.3 *with* Ex. 24 at 29.)  Mr. Garvin did not question the accuracy of the representations in § 6.3 regarding the worldwide scope of CPG's business until this litigation.

In connection with the SPA, and in addition to that agreement, CPG, CPGM, and Mr. Garvin entered into a Consulting and Noncompetition Agreement, dated June 3, 2005 (the "C&NA"), which contains a non-competition provision similar to that contained in SPA § 6.3, a non-solicitation provision prohibiting Garvin from soliciting CPG's customers, and a hiring clause restricting the use of certain recently separated employees.  (Ex. 5, ¶¶ 5, 6, & 9.)  The phrase "solicit or contact for any reason" is defined in that document as "any form of direct or indirect contact by Garvin with a Customer, including but not limited to contacts for the purpose of selling or attempting to sell any Services to the Customer."  (Ex. 5, ¶ 6.) Customers are entities or persons who "(a) were regular utilizers of [CPG's] Services at the time of Garvin's sale of the Corporation to CPGMI, or (b) utilized the Corporation's Services on one or more occasions during the two (2) year period ended on the date of" the C&NA. (Ex. 5, ¶ 6.)

C.    **Mr. Garvin's Post-Sale Conduct**

1    GLRS, LLC, which does business under the name Giftcard Loyalty Reward Solutions,
2  was organized as an Arizona limited liability company in late 2005 or early 2006.  GLRS is
3  formally owned by Defendant Rita Garvin, but Mr. and Mrs. Garvin (collectively "the
4  Garvins") are both managers of GLRS and are responsible for its operations.  GLRS occupies
5  facilities at 7405 East Monte Cristo Drive, Scottsdale, AZ (the "Monte Cristo property"), a
6  facility owned by Garvin Holdings, LLC, a company that is both owned and managed by Mr.
7  Garvin.  GLRS leases space at the Monte Cristo property pursuant to an oral lease with
8  Garvin Holdings, under which GLRS promised to pay Garvin Holdings $1,000 per month
9  as rent.  GLRS, however, has never paid rent to Garvin Holdings during the two years that
10  it has been located at the Monte Cristo property, and Garvin Holdings has never pressed
11  GLRS to pay.  The Garvins and their companies pay for many of GLRS's operating expenses,
12  including telephone service, Internet services, and office equipment.  GLRS has employed
13  several employees and consultants, whose salaries, wages, and fees were often paid for by
14  the Garvins.  GLRS has not reimbursed the Garvins for amounts expended on its behalf.

15    Garvin Promotion Group, LLC ("GPG") was organized as an Arizona limited liability
16  company in January 2007.   According to papers filed with the Arizona Corporation
17  Commission, Mrs. Garvin is the sole owner and manager of GPG.  GPG has a stated mission
18  of providing "consumer promotion programs (rebates, sweepstakes, gift cards, [and]
19  premium fulfillment)."  (Ex. 42 at GPG/CPG 000947.)  The services offered by GPG are
20  virtually identical to aspects of CPG's Business, as described in the SPA.  During 2007 and
21  2008, Mr. Garvin permitted issuance of at least two public pronouncements describing him
22  as the "founder" of GPG.  These statements include a 2007 article concerning the renaming
23  of the Thunderbird School of Global Management, which states that Mr. Garvin "founded
24  Scottsdale-based [GPG], an international promotional marketing firm" (Ex. 26 at 2), and the
25  Phoenix Suns 2007-2008 Media Guide, which describes Vice Chairman Sam Garvin as the
26  "founder of [GPG], an international strategic promotion marketing firm headquartered in
27  Scottsdale."  (Ex. 30 at CPG 0470.)

28

GPG operates its business from the Monte Cristo property, where it prominently displays a large GPG flag on a flag pole in the front of the building, GPG signage in the parking lot, and a large GPG banner in the reception area. GLRS has no exterior signage at the Monte Cristo property other than an 8 1/2" x 11" piece of copy paper affixed to an exterior door. GPG's local and long-distance phone service is paid for by the Garvins. Callers reaching the GPG telephone number at the Monte Cristo property are greeted by the message: "You have reached Garvin Promotion Group, home of Gift Card Loyalty Reward Solutions, if you know your party's extension, press it at any time, for the company directory, press 1 now." (Ex. 1.) Mr. Garvin maintained an extension on this voice mail system. Mr. Garvin also utilized a GPG email address, sgarvin@garvinpromo.com. GPG has no bank accounts or independent funding source, and it relies entirely on the Garvins, individually or through one of the companies that they own and control, to pay all of its expenses.

The Garvins, through GLRS, have paid approximately $41,000 for GPG's start-up costs, including GPG's web hosting, GPG's email addresses, GPG's domain name registration, and GPG's flag and other signage. Additionally, the Garvins shared resources, including employees, between GPG and GLRS as if it were one company. Though GPG has no permanent employees, it may borrow them at will from GLRS, and at least one employee, Amanda Edwards, was offered a position by Mrs. Garvin with "GLRS/[GPG]" and, once employed, used an email signature block that described her as the "Promotions Coordinator" for "[GPG]/GLRS." (Ex. 52 and Ex. 54 at GPG/CPG 000926.)

In June of 2007, GPG and GLRS began providing rebate promotion services to Innovative Brands, LLC, a company owned in part by Mr. Garvin. (Exs. 33, 39; and Ex. 22 at SG 0302.) The initial promotion services performed for Innovative Brands were two "satisfaction guarantee" promotions in which consumers purchasing products received their money back if they were not satisfied with the products. GLRS expressly designated these promotions as "rebates" on its billing invoices. GPG or GLRS continued to provided rebate services to Innovative Brands throughout the remainder of 2007. (Ex. 22 at 323-24, 326, 329, 332-33, 343, 345, 350-51, 360.) On approximately May 22, 2007, Mr. Garvin assisted

in the preparation of a business-to-business rebate for Dannon Yogurt products sold by Creative Food Service ("CFS") to local businesses. Mr. Garvin used a current CPG employee, Steven Tucker, for the Dannon promotion's graphic design work. (Ex. 15 at CPG 171-72, 178.) On May 31, 2007, Mr. Garvin arranged to provide promotion services to CFS for a business-to-business rebate on Sara Lee food products sold by CFS to local businesses. Unlike the Dannon promotion, the Sara Lee rebate did run and GLRS was responsible for preparing the graphic design work and processing rebate checks. (Ex. 15 at 190; Ex. 49 at 391.) Again, Steven Tucker's services were used for the graphic design work.

Beginning in mid-July 2007, GPG began to send more than five hundred targeted direct-mail solicitations to prospective customers. Included with the solicitation letter was a mock rebate form featuring the prospective customers' product logo. Several of the targeted customers were expressly identified in the letter as current customers of CPG. (Ex. 65 at GPG/CPG 000672, 675; Ex. 66 at GPG/CPG 000121, 201, 312.) In sending the letters, GPG used a list of prospective customers developed by Mrs. Garvin and GPG/GLRS employees. At least one entry on the list expressly identifies the prospective customer as a current customer of CPG. (Ex. 55 at GPG 0036.)

Starting in August 2007, GPG began sending solicitations for promotional services in the form of "email blasts" to prospective customers. (Ex. 57.) The email blasts offered to let GPG solve the recipients' rebate problems and directed each recipient to contact Mrs. Garvin by phone or email. Beginning in December 2007, the email blasts also directed the recipients to GPG's website, www.garvinpromo.com. In sending out the emails, GPG utilized a list of prospective customers prepared by Mrs. Garvin and employees of GPG/GLRS. As a result of the direct-mail and email solicitations, GPG had follow-up communications with several prospective customers. Those communications contained quotes in which GPG offered to perform rebate promotion services for these companies for specific prices. (Ex. 54.) As to each of these quotes, there was nothing to indicate that GPG was anything short of being willing and able to perform the specified work at the time quoted.

1     In August 2007, GPG, through Mrs. Garvin and on the recommendation of Mr.

2   Garvin, extended a full-time employment offer to Lily Ramirez for the position of GPG's

3   Director of Sales.  Mrs. Garvin represented that GPG had "one or two large accounts" and

4   needed an aggressive employee to pursue and close GPG's more than five hundred

5   prospective customers.  Ms. Ramirez was offered an annual salary of $60,000 with a

6   potential to earn unlimited commission if she was successful in closing on contracts for new

7   accounts.  (Ex. 51.)  Mrs. Garvin specified a first-year commission target of $75,000.

8     GPG placed its website ("the Website") on the Internet in November 2007.  The

9   Website describes the promotion services available to prospective customers in detail and

10  states that GPG was launched on September 7, 2007.  Though Mr. Garvin's name does not

11  appear on the Website, its prominently-featured description of the GPG team's "90 years of

12  combined experience" includes Mr. Garvin's years in the promotion business.  (Ex. 50.)

13  Although it was argued that the Website was merely a beta version, no steps were taken to

14  prevent the general public from accessing the Website, and by distributing the Website

15  address through the email blasts, CPG actually encouraged prospective customers to visit the

16  site.

17    During November and December 2007, Mr. Garvin had two meetings with

18  representatives of CSK, a company he knew to be a current client of CPG.  The purpose of

19  the meetings was to offer GPG's promotion services to CSK.  Participating in the meetings

20  for GPG were Mr. Garvin, Nikki Woodward, and Amanda Edwards.  At the December

21  meeting, which took place at the Monte Cristo property, Mr. Garvin provided CSK's

22  representatives with a business card identifying him as GPG's Chief Executive Officer.  (Ex.

23  44.)  He also provided CSK with a quote for rebate services.  (Ex. 45.)  Mr. Garvin's purpose

24  in doing so was to start the process whereby CSK would become a GPG customer during

25  2008.  (Tr. at 309:22-311:17.)

26    At the December meeting, Mr. Garvin provided CSK representatives with a "deck,"

27  a packet of marketing materials touting GPG's abilities as a promotion services company.

28  The deck described Mr. Garvin as presently involved in the operations of the company, along

with Mrs. Garvin, Nikki Woodward, Maxine Kesten, and Brian Hatch. The deck recited GPG's operations in detail, including the 7,500 square feet of office space that it currently occupied at the Monte Cristo property, the Rapid-Rebates.com Internet lookup page, and a list of purported clients of GPG. The deck contained GPG's mission statement, which advertised that its "senior executive team," which according to the deck included Mr. Garvin, would be involved in "each and every client promotion." (Ex. 42 at GPG/CPG 000945, 947.)

In December 2007, Mr. Garvin met with a representative from Henkel/Dial at the Monte Cristo property. Like the meetings with CSK, the purpose of the meeting was to sell GPG's promotion services to Henkel/Dial. Participating in the meeting for GPG were Mr. Garvin, Nikki Woodward, and Amanda Edwards. At the meeting Mr. Garvin provided Henkel/Dial with a marketing deck that was virtually identical to the deck given to CSK, and a business card describing him as GPG's Chief Executive Officer. (Ex. 43.) Mr. Garvin's stated purpose in holding the meeting was to obtain Henkel/Dial's business for GPG in 2008. (Tr. at 329:11-17.)

Mr. Garvin has directly involved himself in the operations of GPG. During 2007, Mr. Garvin was directly involved in each of the following activities on GPG's behalf: (1) designing the GPG logo; (2) procuring GPG's web hosting; (3) procuring GPG's signage; (4) designing the GPG email blast; (5) recommending Lily Ramirez as a candidate for employment at GPG; (6) meeting with potential GPG customers CSK and Henkel/Dial; (7) assisting with the design of a mock rebate form that was included in direct mail solicitations sent to prospective customers; and (8) assisting with the startup of Rapid-Rebates.com, an Internet-based rebate lookup page presently used in connection with Innovative Brands rebates.

At times relevant to this litigation, the Garvins have used at least three former or current CPG employees for work related to GPG/GLRS. Until July 2007, Nikki Woodward was employed by CPG as the Vice President of Information Technology. (Tr. at 98:10-12.) Around the time of her departure from CPG, Ms. Woodward contracted with the Garvins to provide technology services for the benefit of GPG/GLRS. In the months following the

conclusion of her CPG employment, Ms. Woodward's small business, Programagic, Inc., designed a computerized rebate processing system for GPG/GLRS. (Ex. 41; Tr. at 284:11-286:11, 321:20-24.)

At the time of the Preliminary Injunction Hearing in this case, Steven Tucker was employed by CPG as a graphic designer, a position that he held for all of 2007. (Tr. at 97:24-98:9) As early as May 2007, the Garvins began using Mr. Tucker's graphic design services for rebates that GPG/GLRS was running, as well as to design GPG's logo, assist in email blast design, and to prepare a mock rebate form that could be used in solicitations sent by GPG to prospective customers. (Ex. 15.) A third former CPG employee, Maxine Kesten was employed as its Chief Financial Officer until 2006, and as a financial consultant to CPG until early 2007. (Tr. at 98:13-99:8.) Beginning no later than December 2006, Mr. Garvin utilized Ms. Kesten's services for various activities on behalf of GPG/GLRS, including establishing phone service, arranging for data entry services needed to run rebates, and arranging for customer call center services needed to run rebates. (Ex. 40; Tr. at 273:18-275:17.)

### D.    The Slogan

From approximately 2000 to late 2005, CPG promotional materials, including the CPG website, have consistently featured the slogan "FROM REBATES TO SWEEPSTAKES, THERE'S NO CONTEST" (the "Slogan"). (Tr. at 35:11-37:6, 70:21-73:13; Exs. 13, 16, 17.) The Slogan appeared on the CPG website home page—frequently the initial point of entry for those accessing the website—where it was the only slogan used and was presented in large type towards the top of the page. (Ex. 16 at CPG 0532.) When used, the Slogan was often featured prominently, and at times was the lead slogan on both electronic and print promotional materials. (Ex. 13.) At the end of 2005 the Slogan was removed from the home page of the CPG website in an effort to "freshen up" the marketing presentation and update the promotional copy. (Tr. at 73:3-74:23.) However, the Slogan was still in use, and could be found on the "Contact Us" page where it was displayed through the fourth quarter of 2006. (Ex. 17 at CPG 0685.)

Since inception, GPG has used the Slogan in its marketing materials, including both electronic and print media. The marketing decks presented to CSK and Henkel/Dial both prominently featured the Slogan on the cover. (Exs. 42, 43.) Additionally, the GPG website displayed the Slogan in large, bold, capital-letter print at the top of its home page. (Ex. 50 at GPG/CPG 001065.)

## II. CONCLUSIONS OF LAW

### A. Motion to Dismiss

The Federal Rules of Civil Procedure require "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 248 (9th Cir. 1997). Thus, dismissal for insufficiency of a complaint is proper if the complaint fails to state a claim on its face. *Lucas v. Bechtel Corp.*, 633 F.2d 757, 759 (9th Cir. 1980). A Rule 12(b)(6) dismissal for failure to state a claim can be based on either: (1) the lack of a cognizable legal theory; or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984).

In determining whether an asserted claim can be sustained, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754 (9th Cir. 1994). As for the factual allegations, the Supreme Court has explained that they "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). In ruling on a motion to dismiss, the issue is not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims. *Gilligan*, 108 F.3d at 249.

Defendant Samuel Garvin argues that Plaintiffs have failed to state a claim for breach of the non-compete covenants contained in both the Stock Purchase Agreement and the Consulting and Noncompetition Agreement (collectively "the Covenants") because the

provisions in those documents are invalid and unenforceable due to their worldwide geographic scope.[2]

### 1.     Enforceability of the Covenants

In Arizona, a covenant not to compete entered into in connection with the sale of a business will be enforced if it is reasonably limited in time and space, and no "broader than necessary to protect the interest of the buyers." *Gann v. Morris*, 596 P.2d 43, 44-45 (Ariz. Ct. App. 1979). The reasonableness of a non-compete agreement "'depends on the whole subject matter of the contract, the kind and character of the business, its location, the purpose to be accomplished by the restriction, and all the circumstances which show the intention of the parties.'" *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 725 (Ariz. 2006) (quoting *Gann*, 596 P.2d at 44). When a non-compete covenant is reasonably limited in time and geographical scope, "the covenant is ordinarily valid unless it is to refrain from all business whatsoever." *Gann*, 596 P.2d at 44. Whether a covenant not to compete is reasonable is a question of law that is to be decided by the court. *Id*.

The public policy concerns relevant to non-compete covenants incorporated into contracts for the sale of a business are distinct from those that arise in the area of employment contracts. *Id*. A restrictive covenant that affects an individual's ability to work in his chosen field is subject to substantial scrutiny because it can "seriously impair his ability to earn a living." *Id*. Additionally, when individuals enter into agreements that prospectively prohibit their ability to work, they are often at a disadvantage in bargaining power when pitted against an employer having substantially greater resources and acting on advice of counsel. While covenants that restrict the activities of a former employee are strictly construed against the employer, Arizona courts do not take the same approach when reviewing a covenant ancillary to the sale of a business. *Id*.; *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1282 (Ariz. 1999); *Amex Distrib. Co., Inc. v. Mascari*, 724 P.2d 596, 600 (Ariz. Ct. App. 1986).

---

[2]The SPA and the ancillary C&NA contain similarly limited non-compete covenants.

In the context of a sale of business, both parties are typically represented by counsel and both have some bargaining power while negotiating the transaction. Most importantly, however, is that "[w]hen a business is sold, the value of that business's goodwill usually figures significantly into the purchase price. The buyer therefore deserves some protection from competition from the former owner." *Farber*, 982 P.2d at 1282. Protecting the buyer's investment in goodwill factors heavily into the reasonableness analysis and has been consistently cited by Arizona courts as a primary reason weighing in favor of enforcing sale of business non-compete agreements. *Id.* ("A restraint accompanying the sale of a business is necessary for the buyer to get the full goodwill value for which it has paid."); *Mascari*, 724 P.2d at 600 (contrasting restrictive employment covenants with those used in connection with the sale of a business, where "courts are more lenient because of the need to see that goodwill, which is usually sold, is effectively transferred"); *Gann*, 596 P.2d at 45 ("The sale of such a business necessarily includes the sale of good will and the purchaser has the right to assure himself as best he can of the transfer of the good will."); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 601 (9th Cir. 1991) (refusing to rewrite a non-compete provision where the consequence would be "to give back to [seller] that which it chose to sell").

Contrary to the argument offered by Mr. Garvin, there is no immutable rule regarding the geographic scope of a covenant not to compete in the sale of business context. No single spatial scope can be applied across all factual circumstances, thus, no geographic limitation can be deemed *per se* unreasonable. Arizona approaches the issue of restrictive covenants by asking a single controlling question: is the restriction reasonably limited in time and space so that it is not broader than the buyer's legitimately protectable interest. In making this determination, courts following Arizona precedent must examine the totality of the circumstances surrounding the parties' sale of business agreement. Mr. Garvin asks the Court to find the Covenants unenforceable on their face because of their worldwide scope. That is not the law of Arizona. This Court is required to examine all of the circumstances before it can determine whether the Covenants are reasonable.

## 2. Reasonableness of Covenants

In his Motion to Dismiss, Mr. Garvin argues in the alternative that even if the Court determines that a worldwide non-compete could be enforceable under certain circumstances, those circumstances do not exist in this case. To agree with Mr. Garvin's argument, the Court would need to conclude that Plaintiffs have failed to allege facts that "raise a right to relief above the speculative level" when considering whether a three-year worldwide restrictive covenant was reasonable. *Twombly*, 127 S. Ct. at 1965. "Reasonableness is a fact-intensive inquiry that depends on the totality of the circumstances." *Farber*, 982 P.2d at 1283. A 12(b)(6) motion is not the appropriate forum in which to delve into the required "fact-intensive inquiry." It is enough that Plaintiff has alleged the importance of the goodwill purchased, the scope of CPG's business at the time of the sale, the sophistication of the parties, and the representations made in the contract. These things, taken together, show that Plaintiffs have moved beyond speculation, and are entitled to present evidence to support their claims.

## B. Motion for Preliminary Injunction

A plaintiff is entitled to a preliminary injunction if it can show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and the balance of hardships tipping in [the movant's] favor." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir. 1993) (quoting *Diamontiney v. Borg*, 918 F.2d 793, 795 (9th Cir. 1990)). The above standard is a "sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* Thus, if a party can show "a strong chance of success on the merits, he need only show a possibility of irreparable harm." *Id.* at 517 (quoting *Bernard v. Air Line Pilots Ass'n, Int'l, AFL-CIO*, 873 F.2d 213, 215 (9th Cir. 1989)). But if a party can show "only that serious questions are raised, he must show that the balance of hardships tips sharply in his favor." *Id.*

### 1. Likelihood of Success on the Merits

#### a. Covenants Not to Compete

The Court has determined that the covenants not to compete contained in the SPA and the C&NA are not *per se* unreasonable, therefore, the question remains whether Plaintiffs have demonstrated either a likelihood of success or serious questions going to the merits of the claim. To succeed on this claim, Plaintiff must establish that the non-compete covenants are reasonable—an issue of law that the Court will decide here—and that Mr. Garvin's actions constitute a breach of these covenants—an issue of fact.

### (1)      Reasonableness of the Covenants

The Covenants prohibit Mr. Garvin from engaging in the Business for a period of three years, as that term is defined in the SPA. The SPA defines CPG's "Business" as "the business of processing and fulfilling rebates, gift cards and other promotional items for other companies." (Ex. 4 at 1.) The geographic scope of the Covenants extends throughout the entire world.

### (a)      Protectable Interest

A reasonable restraint is one that is "no broader than the [buyer's] legitimately protectable interests." *Mascari*, 724 P.2d at 600. Thus, it is necessary to examine precisely what interests Plaintiffs sought to protect using the Covenants, and whether those interests were legitimate.

Mr. Garvin built CPG from the ground up with little more than his own ingenuity and diligence. At the beginning, he was operating "out of the trunk of [his] car." (Tr. at 371:6-10.) More than a dozen years later, when he sold CPG to CPGM, he had turned CPG into a business with annual revenues in the neighborhood of one billion dollars. Over this time, Mr. Garvin developed personal relationships with many of CPG's clients. In fact, Mr. Garvin testified that he would be able to easily reenter the Business should he choose to do so given his long tenure at CPG and his many years of close contact with CPG's clients. This general idea is recognized in the C&NA which states, "[t]he parties acknowledge that Garvin, by virtue of the high executive position held by him with the Corporation over a long period of time, has special expertise in the operation of the Business." (Ex. 5 at 1.)

The Covenants were executed for the express purpose of "preserv[ing] the goodwill associated with the Business." (Ex. 5 at 9.) As discussed above, the ability to preserve goodwill when selling a business is of paramount importance and is universally recognized by Arizona courts as a legitimately protectable interest. It is clear that Mr. Garvin possessed substantial goodwill at the time of the SPA. Recognizing this, CPGM purchased this goodwill and it was transferred at the time of the sale. The goodwill acquired from Mr. Garvin is of significant value and is plainly an interest that may be protected using a restrictive covenant.

### (b)     Scope of the Covenant

A covenant not to compete must be reasonable in scope. "A restraint's scope is defined by its duration and geographic area. . . . The activity prohibited by the restraint also defines the covenant's scope." *Farber*, 982 P.2d at 1284-85. "Reasonableness is a fact-intensive inquiry that depends on the totality of the circumstances." *Id.* at 1283. The reasonableness of a non-compete agreement "'depends on the whole subject matter of the contract, the kind and character of the business, its location, the purpose to be accomplished by the restriction, and all the circumstances which show the intention of the parties.'" *Fearnow*, 138 P.3d at 725 (quoting *Gann*, 596 P.2d at 44).

At the time that the SPA was executed, CPG had conducted either promotion or fulfillment activities in numerous countries around the globe, including, but not limited to, Australia, New Zealand, the countries of the EU, non-EU European countries, Iceland, India, Malaysia, Singapore, Israel, Jordan, Japan, Honduras, South Africa, Taiwan, Argentina, Canada, and the United States. Based on this list of countries, it is evident that CPG was conducting business on every inhabited continent in the world. CPG maintained offices in multiple locations on two of those continents, and operated through an affiliate on a third. In addition to the countries that it had served in the past, CPG was continually seeking to add new international business. CPG repeatedly made statements in marketing materials and press releases touting its ability to provide global promotion services. CPG also attended trade shows for the purpose of marketing its services to the diverse international attendees.

In a sense, CPG was truly a worldwide company in that it was providing services in countries around the globe, and it was actively positioning itself to generate business with international clients regardless of the client's location.

Mr. Garvin argues that CPG was not operating in every country in the world and, therefore, the Covenants were broader than necessary to protect Plaintiffs' legitimate business interests. According to Mr. Garvin, a reasonable covenant would have explicitly named the scores of countries where CPG had actually conducted business, without sweeping in many where it had not. As a comparison, Mr. Garvin points to other companies, such as Coca-Cola, which actually sell products in virtually every inhabited place around the globe. This illustration is relevant in one sense; CPG is far from reaching the worldwide market saturation enjoyed by Coca-Cola. However, this, in and of itself, does not make the Covenants broader than necessary, and therefore unreasonable. The Court must balance this against the other factors relevant to assessing the totality of the circumstances.

The time and the business scope of the Covenants have not been challenged by Mr. Garvin, and the Court finds that they are both reasonable. A three year covenant not to compete under the facts in this case does not present a challenging question for the Court. Mr. Garvin's long tenure in the Business coupled with his role as the founder and top executive leave him poised to return to the promotion services industry, even with a three-year forced hiatus. In *Gann*, the Court of Appeals of Arizona found a ten-year duration in a sale of business non-compete to be reasonable. 596 P.2d at 44-45. The Covenants' three-year limitation was necessary to protect Plaintiffs' legitimate interests. Furthermore, the Covenants are restricted to the Business, which does not prohibit Mr. Garvin from engaging in other types of commercial ventures, and thus are reasonable in business scope.

### (c)     Public Policy

The Court discussed the public policy concerns relevant to a sale of business covenant not to compete in the context of Mr. Garvin's Motion to Dismiss, and there is no need to reexamine those cases here. Mr. Garvin elected to sell his goodwill, and public policy weighs heavily against giving back to Mr. Garvin that which he chose to sell. The ability to

effectively transfer goodwill is at the foundation of many business transactions, and without a mechanism to assure the transfer of that goodwill, business deals would surely suffer. The Court is mindful of this and gives appropriate weight to the public policy which encourages protection of the reasonable expectations of buyers and sellers. Here, the non-compete covenant was given "as an inducement to [Plaintiffs] to execute and deliver th[e] SPA and to consummate the transactions . . . and to preserve the goodwill associated with the Business." (Ex. 4 at 9.) Both parties were represented by counsel and both were sophisticated in matters of business. Mr. Garvin acknowledged in the Covenants that CPG's business operations were worldwide, a position that he now strongly protests.

The alleged overbroad geographic scope of the Covenants does not render those terms unreasonable. Any purported overbreadth is outweighed by the reasonable time and business scope of the restrictions, the representations made by Mr. Garvin, the actual global operations of CPG, and most importantly the public policy encouraging the effective transfer of goodwill. Had the geographic scope in the Covenants vastly exceed the legitimately protectable geographic interests of Plaintiffs, then the Court would have reached the opposite result. That, however, was simply not the case. On June 3, 2005, CPG was operating a global business and it was reasonable for Plaintiffs to try to protect themselves from international competition. The Court finds as a matter of law that the Covenants are not unreasonable as written.

### (2) Breach

At the preliminary injunction stage, Plaintiffs must demonstrate either a likelihood of success on the merits or serious questions going to the merits. There is no question that Plaintiffs have shown a likelihood of success on the merits. The Court could easily go through the numerous activities described above that clearly demonstrate a breach of the Covenants, but that is not necessary. At the Hearing, counsel for Mr. Garvin admitted that he had technically violated the Covenants. (Tr. at 585:15-586:4.) This Court is not aware of any legal exception that would permit Mr. Garvin to commit a "technical violation" without breaching the terms of the Covenants. However small Mr. Garvin believes his

infraction to be, it is clear that Plaintiffs do not agree that these violations were of a *de minimis* nature. Plaintiff may be able to establish additional instances of breach at trial, but the Court is satisfied that Mr. Garvin's admission has created a serious question going to the merits.

**b.     Hiring Clause of Consulting & Noncompetition Agreement**

The Hiring Clause of the C&NA provides: "Garvin hereby agrees that during the three (3) year period beginning with the effective date of this Agreement, Garvin shall not hire or attempt to hire any current or former employee . . . until such person has been separated from employment with the Corporation for at least 180 days." (Ex. 5, ¶ 5.) Counsel for Mr. Garvin admitted at the Hearing that Mr. Garvin violated the terms of the Hiring clause by using the services of Steven Tucker, Nicole Woodward, and possibly Maxine Kesten. (Tr. at 586:7-587:4; 600:9-14.) These admissions have created a serious question going to the merits of this claim.

**c.     Solicitation Clause of Consulting & Noncompetition Agreement**

The Prohibition Against Solicitation of Customers provides that Mr. Garvin may not "solicit or contact for any reason" any then-existing client of CPG, or any former client that had used CPG's services in the two years prior to the date of the SPA, for a period of three years. (Ex. 5, ¶ 6.) "[S]olicit or contact" means "any direct or indirect contact by Garvin with a Customer, including . . . contacts for the purpose of selling or attempting to sell any Services to the Customer." (Ex. 5, ¶ 6.) Plaintiffs have offered evidence showing that Mr. Garvin met with representatives of CSK on two occasions. CSK is a customer of CPG, and was a customer prior to the date of the SPA. Mr. Garvin argues that he was not soliciting CSK because he was approached by them, not the other way around. This is of little concern to the Court because the language above clearly prohibits "contact," which includes "contacts for the purpose of selling or attempting to sell." Mr. Garvin admits that he was attempting to sell promotion services to CSK, even if those services were not to start until after June 3,

2008.  This is a clear breach of the C&NA.  Accordingly, Mr. Garvin's interaction with CSK has created a serious question going to the merits of this claim.

### d.     Lanham Act Violation

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use in commerce of "any word, term, name, symbol, or device" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."  Both registered marks and unregistered marks are afforded protection by § 43(a).  *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  To succeed on a § 43(a) claim, a plaintiff must prove (1) that it held a valid protectable mark and (2) that the defendant is "using a mark confusingly similar." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).  Thus, before a plaintiff may offer evidence of confusion, it must first establish that the word or phrase that it seeks to protect is actually a protectable trademark. *Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 594-95 (9th Cir. 2000).

### (1)     Protectable Mark

A mark is protectable if it is distinctive.  *See Comedy III*, 200 F.3d at 595; 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:1 (4th ed. 2008). Distinctiveness carries special meaning in trademark law—"If a designation is not 'distinctive,' it is not a 'mark.'" McCarthy, *supra*, at § 11:2. A plaintiff can establish distinctiveness "by claiming either that (a) its 'symbol' is inherently distinctive, or (b) that even if not inherently distinctive, the symbol has become distinctive through the acquisition of 'secondary meaning.'" *Comedy III*, 200 F.3d at 595 (citing McCarthy, *supra,* at § 15:1). Trademark law recognizes a spectrum of distinctiveness: on one side of the sliding scale, there are arbitrary and fanciful marks, which are inherently distinctive. *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987).  On the other side, there are generic words or phrases, which can never achieve recognition in trademark law. *Id*.  In the middle are the two remaining categories: suggestive and descriptive.  McCarthy, *supra*, at § 11:2.

If a candidate for trademark status is suggestive, then, like arbitrary and fanciful marks, it is inherently distinctive. *Id.* However, if it is only found to be descriptive, then the proponent needs to establish secondary meaning in order to demonstrate its status as a protectable mark. *Id.*

In this case, Plaintiffs argue that the Slogan, FROM REBATES TO SWEEPSTAKES, THERE'S NO CONTEST, is suggestive, and is inherently distinctive. Defendants counter that the Slogan is merely descriptive, and cannot be protected unless it has achieved secondary meaning. Differentiating between descriptive and suggestive words or phrases is not an exact science, and is even more difficult in the case of slogans, which are relatively uncommon in the case law. The Ninth Circuit has employed two different tests to help determine whether a proposed mark is suggestive rather than distinctive, the "imagination test" and the "need test." *Rodeo Collection*, 812 F.2d at 1218. "The 'imagination test' focuses on the amount of imagination required in order for a consumer to associate a given mark with the goods or services it identifies. If a consumer must use more than a small amount of imagination to make the association, the mark is suggestive and not descriptive." *Id.*

The "need test" "asks to what extent a mark is actually needed by competitors to identify their goods or services. If 'the message conveyed by the mark about the goods or services is so direct and clear that competing sellers would be likely to [need to] use the term in describing or advertising their goods [or services], then this indicates the mark is descriptive.'" *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (quoting 1 J. McCarthy, *Trademarks and Unfair Competition* § 11:1, at 434 (2d ed. 1984)) (alterations in original), *abrogated in part on other grounds*, *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1116 n.1 (9th Cir. 1990). These two tests enjoy an inverse relationship; as the requisite imaginativeness increases, the need for competitors to use the term decreases. *Id.*; *Rodeo Collection*, 812 F.2d at 1218.

In the case of a proposed mark comprised of a single word or short phrase, the need test can be highly instructive. For example, in *Miss World*, a case involving the use of the

names "Miss World" and "Mrs. of the World," the court determined that there was a strong need for other pageant organizations to use "a marital prefix and a defining geographic term" as part of the name of the competition. *Id.*; s*ee also Rodeo Collection*, 812 F.2d at 1219 (concluding that there is no need to use the term "collection" when identifying a shopping center because some imagination is needed to connect the two). Here, however, it is difficult to apply the need test because the Slogan contains words that are clearly needed by others in the industry, such as "rebates" and "sweepstakes," yet also contains the double entendre phrase "there's no contest," which, on its own, would be of little use to competitors. McCarthy on Trademarks provides a comprehensive list of 102 marks that have been held suggestive, and 173 descriptive marks. McCarthy, *supra,* at §§ 11:24, 11:72. Of those 275 marks, only one mark contains as many words as the phrase that Plaintiffs seek to protect, and at least three quarters of the marks are either one or two words in length. *Id*. While the need test may be helpful with the typical proposed mark, the Court finds that it is of little assistance where a relatively lengthy slogan is at issue.

Under the imagination test, a proposed mark is suggestive "[i]f a consumer must use more than a small amount of imagination to make the association" between the slogan and the product or service being marketed. *Rodeo Collection*, 812 F.2d at 1218. Plaintiffs suggest that some imagination is required on the part of the listener because all of CPG's services are not included in the Slogan. This argument is unpersuasive because the scope of the Slogan is of minimal relevance to the question of imagination. "Rebates" and "sweepstakes" are two of the services provided by CPG, and no imagination is required to associate these terms with the actual services offered by CPG, even if the list is not exhaustive. Next, Plaintiffs argue that the phrase "there's no contest" necessitates some imagination because it is intended to convey two meanings: industry superiority and an area of CPG's business, contests. This crafty phrase may be catchy, but it does not require any imagination. Upon hearing the Slogan, it is easy to identify the services offered and the claim of superiority. Any imagination necessary to comprehend the Slogan is negligible.

The Slogan is descriptive, not suggestive, and will only be a protectable mark if Plaintiffs can establish secondary meaning.

**(a)     Secondary Meaning**

A "descriptive mark[] may acquire the distinctiveness which will allow [it] to be protected . . . if it 'has become distinctive of the applicant's goods in commerce.' . . . This acquired distinctiveness is generally called 'secondary meaning.'" *Two Pesos*, 505 U.S. at 769 (quoting 15 U.S.C. §§ 1052(e), (f)) (citations omitted).  To determine whether a slogan has achieved secondary meaning, "the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him 'a single thing coming from a single source?'" *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970) (quoting *Aloe Creme Labs., Inc. v. Milsan, Inc.*, 423 F.2d 845, 849-850 (5th Cir. 1970)).  Secondary meaning is a question of fact, and simply seeks to determine whether there is an association in the customer's mind between the slogan and the source.  *Levi Strauss & Co. v. Blue Bell, Inc.*, 632 F.2d 817, 820-21 (9th Cir. 1980).  "Secondary meaning can be established in many ways, including (but not limited to) direct consumer testimony; survey evidence; exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant."  *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999) (citing McCarthy, *supra*, at § 15:30).

The Ninth Circuit has recognized "that evidence of deliberate copying is relevant to a determination of secondary meaning."  *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (9th Cir. 1987); *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo*, 150 F.3d 1042, 1048 (9th Cir. 1998).  Where appropriate, "deliberate copying may suffice to support an inference of secondary meaning."  *Fuddruckers*, 826 F.2d at 845.  Yet, the *Fuddruckers* court declined to hold that evidence of copying creates a presumption of secondary meaning, writing that "competitors may intentionally copy product features for a variety of reasons."  *Id*.

It cannot be reasonably disputed that Defendants deliberately copied the Slogan. The only question that remains is why they chose to do so. On the one hand, Defendants could have selected to use the Slogan simply because it is a catchy, clever phrase, and use of an existing slogan eliminates the need to expend time and money developing a new one. A different view, advanced by Plaintiffs, is that Defendants used the slogan to intentionally confuse potential customers, who may already associate the Slogan with CPG. To further support this position, Plaintiffs highlight that Defendant Garvin Promotion Group selected a strikingly similar name to that of Plaintiff Continental Promotion Group, and that the acronyms frequently used by both companies, GPG and CPG, are virtually identical.

While the evidence of copying may suggest a finding of secondary meaning, the other factors do not. Plaintiffs have offered no direct consumer testimony or survey evidence, which are both highly probative of secondary meaning. Additionally, while the use may have been exclusive from 2000 until 2006, the manner and amount of advertising raise serious questions about the existence of secondary meaning. Plaintiff has argued and offered evidence to support its position that the Slogan was used as a lead slogan during the six-year period of use. As the lead slogan, the Slogan was featured on the homepage of the website, and also figured prominently into marketing materials distributed to prospective clients at various industry conferences. Yet, the evidence shows that CPG used many slogans over this period of time, thereby decreasing the likelihood that the typical consumer would attribute any particular slogan to CPG. Further, no specific funds were targeted to the marketing or proliferation of the Slogan. Rather, it seems that the Slogan was merely one facet of the overall marketing strategy employed by CPG.

When coupled with the lack of any serious marketing effort premised on the Slogan, the length of use also detracts from the claim of secondary meaning. If a slogan were featured in an aggressive national marketing campaign, there is no question that it could achieve secondary meaning in a relatively short period of time. However, here, where Plaintiffs merely incorporated the Slogan into marketing materials which often featured other slogans as well, six years seems insufficient to make a lasting impression on the minds of the

targeted customers.  Additionally, Plaintiffs removed the Slogan from marketing materials and from the website home page in late 2005, relegating it to small type on the website's "Contact Us" page.  For two years, 2006 and 2007, the Slogan went essentially unused.  Even if secondary meaning had been established during the period from 2000 to 2005, it is highly unlikely that customers would continue to make that association given the long absence of the Slogan.  Finally, Plaintiffs' use of a new slogan, FROM REBATES TO SWEEPSTAKES, THERE'S NO COMPETITION, seriously undermines their claim of secondary meaning.  (Ex. 17 at CPG 0588.)  If the Slogan did create an association in the minds of consumers, then it would not serve the interests of CPG to propagate a confusingly similar slogan where only a single word is changed.  By intentionally disseminating this one-off slogan, Plaintiffs' own actions serve as strong evidence that the precise words of the Slogan had not achieved special importance in the marketplace.

To prove secondary meaning, Plaintiffs must have the ability to show that either a "substantial segment" or an "appreciable number" of members of the relevant customer class make the association between the Slogan and CPG.  McCarthy, *supra*, at § 15:45.  Based on the evidence presented at the Hearing, Plaintiffs have not demonstrated the ability to show this association.  Plaintiffs have failed to show a likelihood of success on the merits of their Lanham Act claim, and they have also failed to raise a serious question going to the merits of that claim.  While Plaintiffs may be able to demonstrate secondary meaning at trial through the introduction of additional evidence, the evidence received thus far is insufficient to support the notion that a class of consumers associates the Slogan with CPG.  The outright copying of the Slogan suggests the existence of secondary meaning, but under the facts in this case it is equally likely to be attributable to other factors, including Mr. Garvin's preexisting exposure to CPG's slogans given his long tenure as chief executive, existing animosity between the parties as the result of a past dispute, and lack of a marketing budget at GPG to develop new advertising copy.  The possibility that Defendants appropriated the Slogan because of its secondary meaning in the marketplace is not supported by the evidence.  Because Plaintiffs have failed to show the existence of a protectable mark, the Court will not

address whether use of the Slogan created a likelihood of confusion. *See Two Pesos*, 505 U.S. at 769.

### e.    Unfair Competition

Unfair competition is not an independent tort, but instead an equitable principle that encompasses a number of tort theories including "trademark infringement, false advertising, 'palming off,' and misappropriation," among others. *Fairway Constructors, Inc. v. Ahern*, 193 P.2d 954, 956 (Ariz. Ct. App. 1998) (citing W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 130 at 1013-30 (5th ed.1984)). Plaintiffs' Proposed Findings of Fact and Conclusions of Law argues, in four brief numbered paragraphs, that the Garvins unfairly competed with CPG. No specific tort is alleged and Plaintiffs do not offer any legal standard by which the Court can accurately judge their claim. As Prosser and Keeton have recognized, the area of unfair competition "is open-ended, and nameless forms of unfair competition may be recognized at any time for the protection of commercial values." W. Page Keeton et al., *supra*, § 130 at 1015. A bare-bones allegation of unfair competition may be sufficient at the pleading stage, but without a more developed legal theory of recovery it cannot serve as the basis for the extraordinary remedy of preliminary injunctive relief.

### 2.    Possibility of Irreparable Harm and the Balance of Hardships

After proving a likelihood of success on the merits, a plaintiff "must demonstrate that there exists a significant threat of irreparable injury" before obtaining a preliminary injunction. *Oakland Tribune, Inc. v. Chronicle Publ'g Co., Inc.*, 762 F.2d 1374, 1376 (9th Cir. 1985). The degree of irreparable harm that must be demonstrated decreases proportionally as the probability of success increases. *Id.* Plaintiffs have demonstrated an overwhelming likelihood of success on the merits of their claims relating to the Covenants, thus, the required showing of irreparable harm is necessarily lower.

Nevertheless, with respect to the breach of the Covenants, the evidence suggesting a possibility of irreparable harm in this case is substantial. As Mr. Garvin told the Court, if he chooses to reenter the promotion services industry, he possesses the knowledge and resources to become a formidable competitor in short order. His many years in the industry and

extensive industry contacts would allow him access to many large and potentially lucrative accounts. The moment that Mr. Garvin begins to compete, CPG can reasonably expect to have their business negatively affected. CPG paid for the right to avoid this circumstance for the three years following June 3, 2005, and Mr. Garvin agreed to refrain from the Business during that time. Even if no harm has come about up to this point, the Court concludes that Mr. Garvin's actions carry with them the possibility that Plaintiffs could be irreparably harmed, a possibility that is neither remote nor speculative.

Plaintiffs have asked the Court to extend Mr. Garvin's obligations under the Covenants for a period of time beyond that set forth in the SPA. Plaintiffs have offered no Arizona authority to suggest that the Court has the ability to award such relief, and the Court will not extend the Covenants in the face of precedent which seriously discourages any alterations to agreements beyond those permitted by the narrowly drawn blue-pencil rule. *See Varsity Gold, Inc. v. Porzio*, 45 P.3d 352, 356 (Ariz. Ct. App. 2002) ("any judicial reformation of a restrictive covenant beyond implementation of the 'blue-pencil' rule is a 'significant' modification of the provision that cannot be tolerated").

**IT IS ORDERED** denying Defendant Samuel Garvin's Motion to Dismiss (Doc. 10) and denying as moot Defendant Samuel Garvin's Motion to Expedite Consideration of Motion to Dismiss (Doc. 39).

**IT IS FURTHER ORDERED** granting in part and denying in part Plaintiffs' Motion for Preliminary Injunction (Doc. 4). Plaintiffs' Motion is granted with respect to all claims concerning the Covenants. Plaintiffs' Motion is denied with respect to its Lanham Act claim and unfair competition claim.

**IT IS FURTHER ORDERED** that Defendant Samuel Garvin may not engage in the Business, as that term is defined in the Stock Purchase Agreement, until three years after the date specified in the SPA. Samuel Garvin may not solicit, hire, or interact with any current or former employees of CPG in a manner violative of the Covenants. Nor may Samuel Garvin solicit or interact with any current or former clients of CPG in a manner violative of the Covenants. Samuel Garvin is prohibited from engaging in the activities described in ths

paragraph, and he may not accomplish what is prohibited herein indirectly through any person or entity.

**IT IS FURTHER ORDERED** that GLRS, LLC and Garvin Promotion Group, LLC, being inextricably tied to Samuel Garvin, may not conduct any operations in a line of business that includes the Business, as that term is defined in the Stock Purchase Agreement, until Samuel Garvin is permitted by that agreement to reenter the Business.

**IT IS FURTHER ORDERED** recognizing that GLRS, LLC may presently be involved with one or more ongoing promotions. GLRS, LLC is prohibited from continued involvement in those promotions, however, it may make arrangements to have those services provided by an outside organization, so as not to affect those members of the public waiting to receive payment for previously submitted fulfillment requests.

**IT IS FURTHER ORDERED** that this Preliminary Injunction is in effect until June 3, 2008.


DATED this 7th day of May, 2008.



_____
Susan R. Bolton
United States District Judge